Counsel, please approach. Who's going to argue? Give us your names and let us know who you represent. Good morning, Your Honor. My name is Chris Geekus. Actually, my long name is Constantine John, but my nickname is Chris. And I represent the appellant, Frank Movis Jarvis, who's with us in court today. My partner is John Geekus, my son, and he's here for moral support. Good morning, Your Honor. Eric Mattson. I represent Northwestern University, Joseph Walsh, and Lauren Qualkenbush. I'll be arguing on their behalf, and I'll be addressing the absolute privilege argument this morning. And I'd like 10 minutes and reserve 5 minutes for my co-counsel to address the conspiracy issue. My name is Lisa Hostin, and I represent Dr. Wong, Dr. Levine, and Michelle Acer. Acer, it's spelled O-E-S-E-R. I'm Hostin, H-A-U-S-T-E-N. All right, I get it right. Hostin, we got it right here, okay. All right, yeah, I didn't bring those with me, so. Okay, the usual rules will apply here today, 15 minutes per side. If you want some time for rebuttal, please preserve it. If we unduly burden you with questions, we might sort of wink at the time requirement. The microphones here are for recording, not amplification, so keep your voice up so everybody can hear you. All right, we can proceed. And I'm going to start off right away. You can stay there for a second. Something that neither of you addressed, I can appreciate why one side wouldn't have addressed it, but there was an opinion letter in 1993 of the ORI, which is obviously the agency, and the opinion letter is titled, The Whistleblower's Conditional Privilege to Report Allegations on Scientific Misconduct. And it states as follows, Consistent with the PHS regulations, ORI believes that whistleblowers possess a conditional or qualified privilege to disclose in good faith to the proper institution or ORI officials allegations of scientific misconduct. Such a conditional privilege would protect the whistleblower from defamation claims, even where allegations ultimately prove to be untrue. I just thought I'd point that out since that kind of sets the standard. So as I said, I can appreciate why one side didn't have this, but I'm surprised the other didn't. I'll address that, Your Honor, in my argument. With that, you can roll. Okay. May it please the Court, good morning again. I'm Chris Gekas, and I represent Frank Movis Jarvis. And let me move to the issue that Judge Smith just raised very briefly. I would suggest or I understand that the surprise that Your Honor has indicated about which side did not raise it is directed at the appellant in this case. We considered raising it, but it has been removed from what we understand to be the authoritative website of the Department of Human Services. At least that's the way it appeared to us. When was that removed? I don't know, Your Honor. When it was. Prior to the time, though, that the motions were argued in the lower courts. I believe that's correct. I'm not sure. If I may have leave of court, I can submit an additional thing about that. I think I am correct. I haven't studied the issue recently. We are aware of it. And your complaint was grounded in conditional privilege. Yes, it was. Indeed, Your Honor, to move to the question of privilege, we think that it's absolutely clear, as suggested by the authority that Your Honor have mentioned that absolute privilege does not apply and should not apply to allegations that are made in the research misconduct context at the university. And we would say that is true in any university context, whether it's public or private. In this case, however, there's an additional reason for it not to apply because this is a private institution. And our briefs talk about the question of whether or not that is relevant. We think it is because under the common law of Illinois, indeed under the common law throughout the country, absolute privilege generally applies to quasi-judicial proceedings, legislative proceedings, and other acts of state. And so, therefore, because this is a private university, we think that just simply as a matter of law and as a matter of the policy underlying it, that it cannot apply in the private university context. Now, there is some argument by the appellees in this case that the proceedings here are of a quasi-judicial nature. And they don't go as far as saying that the university or at least this part of the university is a public body. But they do try and sort of have both fish and fowl in making that suggestion to the court without real law. Well, certainly the research and the writing that's being done is something that's ultimately for the public good. No, that's absolutely right. And in addition, Your Honor, the research that is at issue in this case is publicly funded. But there's a very, very compelling body of longstanding law that has sort of two parts to it. One of them is that just because a private entity performs a public function, a nursing home or a school, it doesn't make it a public entity. And the rules applying to public entities, most importantly in the litigation context, the Civil Rights Act of 1964 and Title VII in 1983, the Civil Rights Act that applies to a whole variety of rights having to do with unlawful takings and a whole bunch of things that we don't need to talk about in any detail, those would attach to the university. And universities, as a matter of consistent policy, always say, as Northwestern has taken a very strict litigation posture and a long history of the litigation that it has, that it's not covered by those Civil Rights Acts because it's not a public entity just because it performs functions that have of a public nature. So that's part of the argument that they sort of imply. The other part of the argument is that they're operating under these federal regulations that are in Part 93 of Title 42. So do you consider those mandatory? Well, they are mandatory. There's no question about it that the university has to set up certain kinds of structures. But the university in this case is not constrained by specific, for example, procedural requirements. And there are some essential procedural requirements that attach to a quasi-judicial proceeding that are absent here that are extremely important in making the decision about absolute privilege in particular. And that is the absence of a right of confrontation, the absence of the right of cross-examination, and the fact that the folks who make these charges, even though they're required by law to make them in good faith, don't make those allegations under oath. Now, the university may have the flexibility to require and to permit accusations under oath, confrontation, cross-examination, but this university has chosen not to do that. And the university, the regulations that apply that are quote-unquote mandatory do not require it. What the regulations do require, however, the mandatory regulations do require that the allegations that are made against researchers have to be made in good faith. Which goes toward the conditional privilege. That's exactly right. Let me follow up on what my colleague brought up in the beginning. You told us that there's a reason why you didn't get into this ORI opinion letter and that it had been taken down at some point in time. And I accept that. The question that I have is, you know, there are also, there's also case law out there that talked about that opinion letter and talked about the application of privilege. And, you know, are you familiar with that case law? No, I'm not, Your Honor. Okay. I'm not. Is there a second? There's at least two. Yeah, there's a couple out there that talk about the application of conditional privilege in this sort of a context as opposed to absolute privilege. No, Your Honor, I'm not. I guess I'm going to have to dig back into the books. Royo is one. Chau is another. Yeah, there's some law. Maryland case law. It's not in the brief. New York case law. Well, Your Honor, there's a couple of cases. They specifically, they specifically say qualified only. And they address your factual situation. Oh, I understood, Justice Lavin, to suggest that the ORI letter that you referred to was discussed in those cases. I am not aware that that's the case. But our brief does cite a couple of decisions, one especially from the Second Circuit, in which qualified privilege is applied as a matter of New York defamation law. And we saw some cases. There's one from Maryland off the top of my head. Right. Royo. Yeah. And there have been a couple of decisions since this case was fully briefed that I discovered in updating some of the research in the course of the last couple of days. And I hesitate to cite them here by surprise to the other side. Well, I'd appreciate it if you'd give them to us. Yes, I will, Your Honor. I was going to ask Lief to be able to do that. There have been a couple of cases. So granted. Thank you. And there is no situation that I am aware of, especially in that Second Circuit case, which is cited, indeed, in our brief. There is no circumstance where absolute privilege has been held to apply to these allegations of research misconduct or analogous allegations. It certainly would be a case of first impression here in Illinois. No, there's no question. One way or the other, right? That's exactly right. The four cases they cite, Weber, Bush, Anderson, and Goldberg, can be distinguished away because it requires the discharge of a duty under expressed authority of law, which yours does not. That's exactly right. And if there is a construction, and this is one of the things that the trial court did not deal with, and it's also something that the appellees don't deal with, if there is a construction of these regulations and of the Northwestern policies and procedures that impose a duty of reporting, and they make this argument very strongly that there is such an obligation, the obligation is one of making only good-faith allegations. Indeed, in our reply brief, we make an argument that there's a lack of coverage. At least there's a factual issue about a lack of coverage of the accusers in this case under the regulations and the policy, because the complaint alleges that they did not make these allegations in good faith. And if you look at the structure of the federal regulations and the structure of the Northwestern policies and procedures, the people that are protected from retaliation, for example, the obligation of the complainant is to make a good-faith allegation. And the reason that we assume ourselves to the point of no coverage is because under both 619 and 615, we have to assume the truth of the allegations, well-pled allegations of the complaint. Indeed, for a 619 motion, it admits the sufficiency of the complaint. And there is a wealth of allegations, detailed, factual allegations in the complaint about the bad faith of these people, that they knew that the allegations were false, that the accusers were responsible for the... Well, there's some allegations going the other way. I mean, there's some he said, she said quite literally going on here. Well, that's right. It seems to me. That's right, there is. But what we do is, as I understand it, under 619, we assume that the complaint is sufficient, and then we look to see in the case of both limitations and absolute privilege whether it bars it. So as to those parts of the lower court's decision that are based on 619, and we think it is clearly the privileged part, we assume the sufficiency of the complaint. That means it sufficiently states an absence of bad faith, period. Why should an employer be held vicariously liable for statements, intentional statements, defamatory statements made by an employee? Well, we think, Your Honor, that that's the law of the state of Illinois, and that's covered in our brief, that vicarious liability for defamation has been something that's been settled for quite a long time. It's not an issue that the trial court grappled with, nor indeed is it an issue that the appellees raised in the court below as a reason to get Northwestern University out of this. Now, maybe there will be a factual dispute if hopefully the case goes back down, and maybe they'll say that the allegations that were made were made outside the scope of the employment of these people, which is one of the ways that. But that wasn't really contested. No, it really wasn't. We alleged that, and the inferences from the complaint allege that the allegations, the accusations that were made against Professor Movis Jarvis were made within the scope of their employment. There is no question about that. And indeed, if you look at the whole context of it, it's allegations of misconduct in the scope of the performance of research that two of the accusers were involved with themselves inside his lab, and then as a competitor, Professor Levine was a competitor of Dr. Movis Jarvis, as we outlined in our complaint in some meticulous detail. And so his allegations were also made within the scope of his employment, and the university can't really have it both ways. If they have an internal policy that requires individuals to make reports, then that internal policy means that when the reports are made, the people making them are acting within the scope of the responsibility of their employment that's imposed on them. So we don't think that the question of respondeat superior is a troubling one, nor indeed do we think. I'm going back to your mandatory. I don't agree with you that these are mandatory. And you should be saying they're not mandatory. But I'm saying to you, after reading Weber, Bush, Anderson, and Goldberg, those were. Your case is not. It's not a discharge under expressed authority of law. I don't see those regs as mandatory. Because there's no consequence. So I'm having a hard time because this should be coming from them, not you. Well, Your Honor, the cautious way for us to deal with this is not to raise the issue of mandatoriness, because the problem is that these are statutorily imposed requirements for a procedure. And what the university is supposed to do is set up this kind of a procedure. They're mandatorily required to do it. Mandatory to a point. That's right. Funding purposes only that they are administrated properly. That's exactly correct. But there is no consequence. But the other side of the mandatory. Except the funding can be taken away. That's right. The other side of the mandatory requirement is that what's mandatory is that the allegations be made in good faith. Right. That's what's mandatory about it. I see what you're saying. And that's the direction that we're coming from, because we think it is a very slippery slope for us to be advocating the question of whether or not all these imposed procedures that they have are required to be imposed, required to be created. And the answer to it is, yes, up to a point. But the thing that really, the kicker for us is the mandatory requirement of good faith. And if you look at both the regulations, and we recite where it is in the federal regulations. Is that my time? No. No, we don't. We don't. Maybe we should, though. Don't push that one. Pages 41, especially of my brief, and thereafter, talk about the good faith requirements. Federal Regulation 93-203 defines a complainant as a person who, in good faith, makes an allegation of research misconduct. 93-210 defines good faith, and it's a standard definition of good faith. You've got to believe in good faith. It's true, and you can't recklessly ignore the fact. And those are repeated almost verbatim in the university's own policies, because they're required to be allegations in good faith. The university could not, as a matter of regulatory policy, they could not adopt the position that the appellees advocate here, that you can intentionally make false allegations against another researcher in bad faith. They couldn't do that. That's the flip side of the argument, essentially, that they're making, that they ought to have the freedom to be able to do that as a matter of Illinois common law. And that doesn't make any sense, because it's going to introduce a tremendous incoherence into the body of this law. There seems to me that there should be no inconsistency in this particular context. And I hope we've demonstrated, both in our brief and our complaint, the tremendous importance of what's at stake here, given the nature of Dr. Movis Jarvis's research, and also from the standpoint of the university, given the nature of the work that it does and the funding that it receives. But the point is that for the university to advocate that anybody can make any false allegation, no matter what their motivation in bad faith, knowing that it's untrue, would be a conflict and an incoherence in the law between the common law of the state of Illinois and the federal law, this mandatory regulation of good faith that is required. And we don't think that that is inappropriate. So if I may, unless there are questions, I'd like to reserve your time for them. One quick question. It's not really related, but how long has he been involved with that university, if you recall? I think the complaint alleges that he came to the university in 2006. Prior to that, he had a very, very distinguished career. He was educated. Yeah, we read it all. Okay. I was going to say he was at Harvard at the Joslin Diabetes Clinic. We got the CV. Okay. And I hope it's clear that the nature of the importance of the research that he's doing should not be unfairly. He's got an obligation to do things right. No one disputes that. But he shouldn't be victimized by competitors and disgruntled employees, not only because it's unjust to the individual, but also because of the policy that the court ought to engraft into the Illinois common law of protecting people from this kind of stuff, especially in the important area of the research that he and the university is doing. Okay. Thank you very much. Thank you. Mr. Mattson. Good morning again. Eric Mattson on behalf of Defendants Northwestern, Qualcomm, Bush, and Walsh. I've heard some skepticism from the bench this morning about our position, and I want to spend the next 10 minutes or so trying to address those issues and see if I can persuade the court, as we tried to do in our brief, that what we're asking the court to do is entirely consistent with existing Illinois law. It just doesn't seem that way. It doesn't seem like it's consistent with other similar law from other states interpreting this sort of privilege. It all so seems to be almost a free shot at any student who is unsuccessful or not doing their best job, and it almost creates a tremendous burden on a university to have to deal with people who may have a free ride who are not suited for their position. Let me address both of those issues, and I'll do it in reverse order and start with what you just said, Justice Smith. That's true whenever you have an absolute privilege, or at least there's a danger of that. But this is a private institution. Well, it's a private institution acting under an overlay of federal regulation, reporting up to the Department of Health and Human Services. In that case, some universities take no federal funding anymore. Well, not research universities. If you want to be a research university, you have to take federal funding in this country. There's just no way around that. But to address your point, and I'll use a couple of examples that hit perhaps close to home to a lot of people in this room, the Judicial Inquiry Board and the ARDC. They do not fit within the category of what this absolute versus qualified. They do. Reports to the ARDC and reports to the JIV are absolutely private. They are in charge of duty under expressed authority of law. My point is that reports to those bodies are absolutely privileged. But that's because there are consequences for lying. And there are consequences for lying in this process as well. To go to the good faith point that Mr. Gekas made, when you read the entire set of regulations, the entire reason they talk about good faith in the course of these regulations and in the course of Northwestern's own policies and procedures, is to show that if somebody acts in good faith, they will be protected against retaliation. If you act in bad faith, just as if you act in bad faith when making a report to the ARDC or act in bad faith in filing a pleading with this court or any other court, there can be severe consequences. You can be kicked out of the university. You can be fired. Those are very severe consequences, at least as severe as what a lawyer faces if he makes a false pleading, if he submits a false pleading in court. So those kinds of situations are directly analogous to what we're talking about here in the sense that, A, there is absolutely a duty to report. That's quite clear. You're saying it's mandatory. It's absolutely mandatory. And I don't buy that. Well, Title 42. No, I've read it. I know exactly what it says. Title 42, Section 289, requires institutions that receive federal funds, as Northwestern is, to set up this process and to require members of the research community to report. To appoint. It requires reporting.  Or a duty, in the Goldberg case, to report misbehavior of a bus driver to the bus company. That's completely distinguishable. Well, it's a different set of facts. True. But it's not distinguishable in the sense that there is a legal duty to report. It's a duty grounded in law to report. 42 U.S.C. Section 289b and the regulations promulgated thereunder. A legal duty to report. And you combine that with the fact that there is a quasi-judicial administrative process that is intended to get to the bottom of what happened. Were the allegations true or not? What about what counsel has said? They're not under oath. Not at the stage that this has gone to. They're not under oath. No subpoenas. There's no consequence directly. There's plenty of due process, Justice Smith. First, the university has to prove research misconduct by a preponderance of the evidence. It has to prove that the conduct was intentional or reckless, not just negligent. It has to give the accused access to all of the evidence that they consider. It has to give the accused the right to be heard. Ample right to be heard. It's not the same as being in court, but it's awfully darn close, and it's at least as much process as you see in these other contexts like the ARDC or the JIB. So what you're basically saying is that the sort of protections that are available in legislative, judicial, and legal proceedings ought to be extended to the academic arena, which hasn't been done yet here in Illinois. Am I accurate there? I wouldn't call it extended because it hasn't been addressed before. But it's certainly extended in the sense that it hasn't been addressed, and so in that sense, yes, it would be an extension. But it's not an extension in the sense that this falls squarely within the kinds of contexts where the court, the courts of this state have found an absolute privilege, whether it's the JIB, whether it's the Goldberg case, whether it's the ARDC, whether it's litigation. That privilege law in Illinois doesn't, you know, to my reading of it, seem to be going in the direction that you suggest we should go here. Are you referring to the Sandholm case? Yeah. Well, that was construing a particular statute. That was the Supreme Court addressing a creature of the Illinois legislature. For the most part, defamation law in this state has been left to this court and the Illinois Supreme Court to determine the parameters of. And whenever this court, the Illinois Appellate Court, has addressed this kind of issue, namely there's a legal duty to report and there's an administrative process cloaked in confidentiality that is intended to address and get to the bottom of what actually happened. And in this case, there's the added feature of a requirement that if it's found that the professor did not commit research misconduct, Northwestern is obligated to take any reasonable steps it's asked to take to restore any reputational harm that he may have suffered. Now, of course, this all would have been confidential if he hadn't chosen to bring a lawsuit. But there's no allegation that anybody involved in the process disrespected that requirement of confidentiality. I want to address, Justice Levin, an issue you raised at the outset about other cases. There's really not a lot of case law on this point. I'm familiar with the Second Circuit opinion that was cited in their brief. I'm familiar with the Chau case that Justice Smith mentioned. And then Arroyo. And I'm vaguely familiar with Arroyo. But the first two, I can say, I think, pretty definitively, did not really grapple with this question of absolute privilege. They just certainly in the Second Circuit case just said, wait a second, on this record, because the Second Circuit case was decided on summary judgment, on this record, we're comfortable saying that there is a qualified privilege and that it was not abused, so affirmed. So it didn't have to grapple with what we're asking this Court to grapple with, namely these very compelling public interests in encouraging people to come forward. There's no question you've got public policy questions here on both sides. Absolutely. I mean, you've got the researcher ought to be able to do his research, and the people who are working on it should be able to make sure that all the information in there is accurate for the public good. Correct. And they should be able to come. And I'm going to ask the Court to consider the consequences of finding only a qualified privilege. Well, why isn't a qualified privilege good enough, as it is in some other contexts? The reason, besides the two points I made earlier, there is a legal duty to report and there is this administrative process in place, is to look at the consequences of making the privilege anything other than absolute. It's the same kind of consequence that led the Illinois Appellate Court to find the absolute privilege applied in multiple other contexts like this. And that is, if you put yourself in the shoes of, say, a 25-year-old researcher working in a lab, whose future career is in the hands of the head of the lab, and you see something that causes you concern and you think maybe you should report it. In this case, that's the one person that's getting out with no consequence. I'm not sure I understand. The lady that was supposed to be preparing everything, for all practical purposes, she's out. Well, she is a defendant, Your Honor. Well, assuming part two goes the way I think it should go, she's out. So this qualified or absolute would make no difference, except that qualified would give both sides a fairer opportunity to totally express themselves, because then it would be based on good faith, not on an absolute, behind-the-scenes, closed-door way of dealing with it. And that exact same issue comes up whenever the court considers applying an absolute privilege. No, I understand exactly what you're saying. I'm just saying I am familiar with incidents in varying universities where a student has, especially in law schools, this is common in law schools, where students abuse a professor and get away with it. And it's under the guise you're saying, almost absolute. And the problem, Your Honor, with trying to stamp out that sort of bad behavior by making the privilege qualified, is that then you also discourage people with good faith complaints from coming forward, especially if they're in a situation where their careers may be at stake. They're just starting out in their careers, and not only are we asking them to come forward and make an enemy of somebody who's got power over their future career, not only are we asking them to come forward and invite scrutiny of their own work, we're also asking them to go through the challenge, to say the least, of discovery and trial and appeal, with no guarantee that the outcome will be absolutely accurate. Is that, for a more reasonable step, the normal process of discovery, which did not occur here? Not in this set of circumstances, not in this context, Your Honor. So you don't think they should be discovered? Correct, Your Honor. That's one of the points of an absolute privilege, is that... Wait, wait, wait. You're saying you don't believe the thing should go through discovery to fully disclose every detail? In the litigation context? Yes. No, Your Honor, because the whole point of an absolute privilege is, just as if I file a pleading, hypothetically... No, I understand, again, what you're saying. I just wanted, on the record, what you're saying, because this, you are asking us to change the law, the law that has been in effect in this state from day one, and you're asking us not to follow what other states do, and you're trying to change it totally. And I'm saying I think we ought to leave things the way they have been. I think the way they've been is that this, if you look at the case law funneling up to this particular factual context, this particular factual context of research misconduct proceedings that are required by federal law, where there's a process in place to get to the bottom of what actually happened. I can't emphasize that enough. What you're suggesting, Justice Smith, is two parallel tracks. You have the university doing its own investigation to try to get to the bottom of whether research misconduct occurred, and then a separate parallel track of discovery, litigation, and trial to get to the bottom of that exact same question. Only if the qualified privilege doesn't work, does it come to that state. Well, the qualified... Your Honor, absolute. It never, that person never has that opportunity, no matter which side. One of the reasons we have an absolute privilege is so that when this situation arises, a case will be dismissed at the pleadings without going through discovery and trial. I understand what I'm saying. You're closing a door. Excuse me. If you don't mind, how does all of this mesh with count three and count four against Walsh and Quickenbush republishing information that they knew to be false? What privilege should they have to do that? Well, they have a duty to report. They had reported it at one earlier time, two years earlier. Well, just to explain, these are the administrators within the university who are in charge of this process, that just like the litigation process is cloaked with an absolute privilege all the way through the process, including... I mean, you're trying to convince us that there's an absolute privilege. I'm asking you, how does this absolute, even the absolute privilege, apply to something that they know was proven to be false at an earlier set of, at an earlier procedure, in an earlier process? I understand the question now, Justice Paczynski, but let me answer it this way. Whenever the absolute privilege applies, no matter what the context is, it applies even if there are allegations of bad faith, knowledge of falsity, ill will, bad motive. And the reason that we have that regime for these unique, narrow contexts that we think this fits within is that it's very easy to allege a bad intent. I mean, how do you really know what's in somebody's mind? It's easy to make the allegation, and it takes heaps of discovery and often a trial before somebody feels comfortable making a determination of whether, in fact, it was in bad faith or whether it was made with knowledge of falsity. So, you know, I suppose the court could look at this set of allegations and complaints and say, it doesn't even get over a qualified privilege. But more often than not, when you're talking about a qualified privilege as opposed to an absolute privilege, you're talking about much more litigation, much more risk, much more disincentive to come forward with the allegation in the first place. Well, maybe that's the whole point. Maybe because you're claiming an absolute privilege, which sort of cloaks all this in a sort of mesh cloud, maybe the qualified privilege is actually the fairer way and the better way to go, because that way you do have discovery and you can't figure out whether or not this man's reputation is being unfairly maligned, whether or not his work is being unfairly maligned, and get to the heart of it. How will he ever get to the heart of it if we agree that there's an absolute privilege? Two responses to that. First, you get to the heart of it by going through the process that the university has. Well, the university has justifying republishing things that they know to be untrue as part of their absolute privilege. That seems to be circular, counsel. No, no, it's not, Your Honor, because the supposed republication was simply notice to Professor Movis Jarvis's bosses of the charge, which they're required to do under the university's policies. Once we get to the end of the process, the university makes a decision, either research misconduct was committed or it wasn't, either this plaintiff committed it or not, and then he can go to the Department of Health and Human Services for further relief. Under the university policy, they were required to re-report charges that had been proven to be false. They were required to report up the chain when they took the steps that they did and decided that further investigation was warranted. Now, of course, the plaintiff says everybody knew this was false from the beginning, everybody made these accusations without any basis in fact and so on and so forth, but if what you're saying is correct, Justice Paczynski, the implication is that we should abolish the absolute privilege across the board. Well, we don't know that there is an absolute privilege for universities. You're saying there is. Well, what I'm saying is that why would we have an absolute privilege ever, whether it's in the litigation context or otherwise? It hasn't been established yet in Illinois, and the cases that you cite include a case from Maryland, but there's also another case from Maryland decided a year after the one that you cited called Arroyo v. Rosen. In that case, the court specifically declined to adopt absolute privilege in a very similar context. A university research associate wanted absolute privilege in the context of research that was being undertaken pursuant to a grant with the Veterans Administration. So, you know, the question is which way should the court go here? I mean, we don't have binding precedent here in Illinois on this limited issue. You want us to be persuaded by the quasi-judicial nature of this. And the duty to report, yes. But, you know, what we're seeing is some evidence of case law in similar circumstances with the same federal regulation that a conditional privilege should apply. And we haven't yet seen a case that says what you want us to do here. Two points in response to that. First, my understanding, and I would, if I could, request leave to submit three or four pages to address these points within the next week. But my understanding of these other cases is that they don't grapple with the question of whether there should be an absolute privilege. They just find that there's a qualified privilege, it protects the defendant in those circumstances, and so there's no case to continue. So I'm not sure that they provide much guidance since they don't really wrestle with these public policy issues that are always at issue whenever you're considering the absolute privilege. The second point is that- Well, we intend to grapple with the public policy issues. Of course. Trust me. And I don't doubt that for a moment. The other thing I'd point out to you is the Indiana Supreme Court case that we cite in our brief, which is in an academic setting. It does not involve research misconduct. Oh, the Purdue case? Correct. Okay. That case is as analogous as any that either party has cited to what this Court is addressing here. Okay. And the Indiana Supreme Court said absolute privilege applies. Gotcha. Unless there are other questions, I will turn it over to my co-counsel. Okay. Thank you very much. Thank you. We'll probably be easier on you. I would like to address the conspiracy count five, which was brought against Wong, Levine, and Acer. It was dismissed pursuant to 2619, and it was a conspiracy to commit defamation. And in order to prevail, the plaintiff needs to establish not only that there was an agreement to defame him, but that a tortious, overt act in furtherance of that agreement took place, and that there were damages stemming from that. And here, the dismissal of count five was correct, because there was no actionable defamation to give rise to the conspiracy. The allegedly defamatory statements by Acer and Levine took place in 2008. And the complaint was not filed until 2011, almost three years later. So there's no actionable defamation to give rise to the conspiracy. And the court also found, separate and apart from that, that the statements were subject to absolute privilege. But I'm not going to go into that, because my counsel has already argued that with you. So the Illinois Supreme Court, in the Addak case, made clear that a civil conspiracy, an action for it, cannot be maintained unless there's an actionable tort that underlies it. And the reason for this is because the agreement itself does not give rise to any damages. You can agree you're going to do something, but you haven't been harmed by that. So the civil conspiracy has to rest on the underlying tort. Now, that's not to say that a civil conspiracy is not a separate cause of action. It is. And the reason that it's a separate cause of action is because it allows the liability for the tort to be spread amongst the co-conspirators. They might not have done the actual tort, but the cause of action allows the liability to be spread to the co-conspirators. But that doesn't erase the fact that it's not a standalone tort. If there's no, in this case, conspiracy to defame, if there's no actionable defamation, there's nothing that the conspiracy can rest on. And that's where plaintiff has gotten confused in arguing that the five-year statute of limitation applies. In essence, what that argument means is that the conspiracy is a standalone tort, because we have the defamation, where the statute of limitations is one year, and it ceases to be actionable after that. And what plaintiff is arguing is, five years later, he can still bring an action for the defamation that expired after one year. I don't think he's going to get very far with that argument. Okay, Your Honor. In that case, I think, unless you have any questions, I'll sit down. I do have a question. You indicated that you're representing Ms. Wong, is that correct? Yes. Could you tell me what was the requirement that she have communication with Dr. Levin? What was his link in this chain of authority? Yes, I can. This is a factual question that kind of goes to both of what they were arguing. And I do think there's an important point here that we need to understand background-wise to explain that. This is a very simple question. She's under the Northwestern policies, apparently a required reporter. She's an employee of Northwestern. If she sees wrongdoing, she's supposed to tell someone in a chain of command. I'm not seeing how, is it Dr. Levin? Yes. Is part of that chain of command. And that's my question. Is he a part of that chain? Dr. Wong did not go to Dr. Levin, which is why I think I need to explain what happened here. What happened is the researcher... Dr. Wong was emailing Dr. Levin and talking to him, is that correct? No, that's not correct. Let me just back up and give you the quick, here's what happened. Michelle Acer was the young researcher in the lab. She was an honor student. There is no question that the images, because plaintiff admits this in his complaint, they were falsified. They had to be corrected. So what she did was she didn't know what to do when this came about, so she had worked for Dr. Levin previously before going to plaintiffs. So the answer to the question is he's a friend of hers, she knows him. But Dr. Wong didn't go to him. What happened was Dr. Wong is the first author on the paper, and the researcher, Mrs. Acer, went to Dr. Levin. She went to Dr. Levin after asking what the proper protocol was from Dr. Levin. She then went to Dr. Wong and said, there's a problem. Here's what needs to be done. It's improper to let this go on. It has to be fixed. I'm going to carbon copy you. So Dr. Wong was simply carbon copied. She said, I'm going to carbon copy you on the letter that I am taking this up with plaintiff. And so Dr. Wong did nothing but be carbon copied there, and then Dr. Wong is the first author on the paper. So Dr. Wong was the one who actually did the experiments, got the actual data, and put it in there, because Dr. Wong was the first author on this, and had a vested interest to make sure that the correct data was in there. But short of that, Dr. Wong was not directly involved in the allegations between Acer and Dr. Levin. All right. Thank you. Thank you, Counsel. Thank you, Your Honor. Mr. Geekus, why should we not follow the Hartman v. Carey case, the Indiana Supreme Court case that involved the Purdue University? There are fundamentally, I think, probably three reasons. The first reason is that there's no obligation, mandatory obligation, of only good faith. And the second reason is that there's no obligation of only good faith. The reason for this is that you can't have bad faith allegations in that case. The second reason is that Purdue University is a university involved, and it's a public institution. And the adjudicatory proceedings that were conducted here were pursuant to a specific statutory grant by the Indiana legislature, and there were, to raise the point that Justice Smith raised, there were sanctions, specific sanctions for making false accusations. The legislature in Indiana apparently has seen the kind of shenanigans arising from victimization of professors by either students or other staff, and so they wrote in specific sanctions. There are no sanctions at all here in the Northwestern procedures. And it brings me to a second point that's related to this due process argument, that this is quasi-judicial proceedings. If you look at the appendix in the university's policy, which is on appendix page 159, it's policy or procedure 1.4, it allows the administration, in this case, Vice President Walsh and Welkenbusch, to completely ignore the proceedings and the conclusions of the original investigation committee, without any explanation. And, indeed, in this case, that's exactly what Walsh said. He conducted his own private investigation, as we allege, some of which we allege in detail, but there's other things that we expect that he did as well, as did Welkenbusch. And then, without an explanation, he said, we're going to go on on these charges even after the facts, number one, and the conclusion of the investigative committee, the inquiry committee, number two, demonstrated to him, without any possibility of reasonable disagreement, that the allegations against Dr. Walsh were false. And then, who did he publish it to? He published it to Dr. Jarvis' deans, which is like a shot in the heart in the academic environment, as a matter of common sense. So, for the university, world-class university that this is, any organization has pockets where there is wrongdoing. This is not an indictment of Northwestern University. This is an indictment of a flawed procedure and several people who had been involved in it. And, indeed, this is not an indictment of a flawed procedure. And, indeed, it's not an indictment of a flawed procedure. And, indeed, this is not an indictment of a flawed procedure. So, for the university, the university did have vindictive motives against Dr. Jarvis, but, for them to argue in this context that it's quasi-judicial and he's protected, when they ignored and rejected the proceedings that were defended, this lawsuit was not filed until after all of that stuff happened. Dr. Jarvis and Dr. Jarvis and Dr. Wong are not witnesses of this case. This is a non-judicial case. And, indeed, this is not an indictment of a flawed procedure. And, then, when it gets up to wall, she brushes it aside without any explanation. Wasn't there some evidence that one of the participants flipped their version of what happened and indicated that your client had applied some pressure? Yes. Dr. Wong was a person. And, I understand this is a question of fact. Yes. But, at least, it's out there. I think, in this record, I think, and I don't remember exactly where it is, it shows that she alleged that Dr. Jarvis made, tried to influence her to lie. But, I think, in the record, it also shows that she did not lie. She eventually went put to the test. She said, I did not do anything, say anything untruthful to the first investigation committee. And, some of the things she said were materially important here to that committee because she went in and she said that Michelle Elzer had come to her the day before the first paper was going to be published. And, she said that the chain of command was not real. And, what did they do in terms of informing Dr. Jarvis? Nothing. They let him submit the paper. And, then, what happened? Michelle Elzer, instead of going up the chain of command, as your Honor asks, what she did is she went to her former mentor, where she used to work, who was a friend of hers, who had no responsibility or involvement at all in the. Okay. All right. I understand that you're animated about it. I get it. Okay. All right. Question for you, though. You mean over-animated. I apologize. Question for you. If this case were against the University of Illinois rather than Northwestern, same result for the court? I think yes. I think the answer is necessarily yes. The context of whatever procedures they would have. But, if this is the policy that the University of Illinois would have adopted, the answer to that is yes because of the mandatory requirement of good faith allegations. What they're asking you to do as a matter of Illinois common law is what they can't do. Because of the mandatory obligation of the federal law requiring good faith, they cannot eliminate from their own internal policies and regulations that obligation. They have to have it in there. But, they're asking you to do that. They're asking you to wipe out both the regulation and their own internal policy. All right. So, is it, then, irrelevant in our determinations that Northwestern is a private as opposed to public university? Well, I think irrelevant is too strong a word. I think it's not determinative. You like strong words up here. I think it's not determinative as another factor. That's what we think about it. And, on that point, just one extra thing. I'd like to deal with conspiracy, too, if I could. We don't need to hear that. We're okay. We're okay. We got that clear in our minds. We don't need any assistance. Thank you very much. I'm not sure whether that is an ominous statement or not. It is. May I briefly address that? We'll give you a minute or two. Okay. But, what was it that I was going to say? I was going to say something about... Conspiracy. Conspiracy. No, I was going to say, well, let me go to conspiracy. This is not the case for you to change the law on conspiracy. The Breitenberg case from 1890, as construed by the Fifth Circuit, held that conspiracy is covered by the five-year limitation period. The case that they cite, Webster against Guero, was a relation-backed case. It doesn't even mention the five-year statute. The trial court did not deal with it. And, of course, I know that an appellee can raise any question that would allow the court to affirm it. This is not the case to do it because you're going to set aside what is... Lawyers rely on these cases. You go and look and say, how long a period of time do I have to file this? And, there's this 1890 case, 120 years ago, that's validated by only persuasive authority, I understand. It's only persuasive, I understand. The Seventh Circuit is not binding on this court. But, a lawyer goes and looks at that stuff and says, well, the law is, the state of the law in Illinois is that I've got five years to do that. Now, why is it important in this case? It's important in this case because the first battle here was within the university's apparatus. The idea that a professor who's accused of this stuff is going to go running into court and sue the commander of the battleship, so to speak, and the battleship itself is borderline ridiculous because of the very difficult position that it puts somebody in, especially a non-tenured professor, as Dr. Movis Jarvis is. And so, the point is that let's fight it within the apparatus of the university, and if it turns out well, then, you know what, it's a bad experience, but it worked out. The problem is the clock is ticking. And so, when you go and look at these, when you go and look at these. Indeed. So, I would suggest that if your honor. We have no hook. We do have a buzzer, but I'm reluctant to apply it. I asked your clerk yesterday whether or not there was a red light, green light, and he said no. Maybe you knew you were vulnerable. But, he said that you would tell me when it was time for me to be quiet. So, I would say that if your honor, you have a mute button on your clicker. May I just say one more thing? No. No. No. Okay. We will decide. You can have a seat. We're going to decide internally if there's any need for any further briefing as had been offered up. We appreciate that. We appreciate the arguments and the briefs presented to us. Very interesting case. A case of first impression. You certainly have our attention. We are adjourned. We have another case, but I think the court is going to consider constitutional matters of a different nature in a five-minute break.